# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL COMPLAINT** |
| | : | |
| v. | : | Honorable Leda Dunn Wettre |
| | : | |
| MICHAEL STEWART | : | Mag. No. 21-13399 |
| | : | |

I, Special Agent Gary S. Beneducci, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigations, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

*s/ Gary S. Beneducci*
_____
Gary S. Beneducci, Special Agent
Federal Bureau of Investigations

Agent Gary Beneducci attested to this Affidavit
by telephone pursuant to FRCP 4.1(b)(2)(A),
on October 28, 2021, in the District of New Jersey

*s/ Leda Dunn Wettre*
_____
HONORABLE LEDA DUNN WETTRE
United States Magistrate Judge

## ATTACHMENT A

## COUNT ONE
### (Murder-for-Hire)

From at least in or around Summer 2021 through in or around October 2021, in the District of New Jersey and elsewhere, the defendant,

**MICHAEL STEWART**,

Did knowingly and intentionally conspire to and use, and cause another to use, a facility of interstate commerce, that is, a telephone, with intent that a murder be committed, in violation of the laws of the State of New Jersey, that is, New Jersey Statutes Annotated, Section 2C:11-3, as consideration for a promise and agreement to pay something of pecuniary value, that is, United States currency.

In violation of Title 18, United States Code, Sections 1958 and 2.

## ATTACHMENT B

I, Gary S. Beneducci, am a Special Agent with the Federal Bureau of Investigation. I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents, and photographs of the evidence. Because this Complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where I assert that an event took place on a particular date and time, I am asserting that it took place on or about the date and time alleged. Where statements of others are related herein, they are related in substance and part.

1. In or around Summer 2021, defendant Michael Stewart ("STEWART") communicated with another individual (the "Confidential Source") and conveyed STEWART's desire to have his ex-wife ("Victim-1") and her daughter ("Victim-2") killed. During multiple communications, STEWART in sum and substance indicated that STEWART would pay U.S. currency to have Victim-1 and Victim-2 killed, and STEWART requested that the Confidential Source find someone to commit the murders.

2. As part of the investigation, law enforcement identified at least one cellular telephone number (the "Cellular Phone-1") utilized by STEWART. Based upon lawfully-obtained location data obtained from Cellular Phone-1, law enforcement understands that STEWART regularly travels to Baltimore, Maryland, and is therefore outside of New Jersey for large portions of the day. Based upon the investigation to date, STEWART utilizes Cellular Phone-1 while out-of-state to communicate with the Confidential Source and/or others in furtherance of his scheme to commit murder.

3. On or about October 19, 2021, STEWART utilized Cellular Phone-1 to communicate with the Confidential Source and arrange to meet with the Confidential Source for purposes of discussing his plan to orchestrate the murders of Victim-1 and Victim-2. Lawfully-obtained location data revealed that Cellular Phone-1 was located in the vicinity of Baltimore, Maryland at the time that STEWART contacted the Confidential Source.

4. On or about October 20, 2021, STEWART again utilized Cellular Phone-1 to communicate with the Confidential Source and arrange to meet with the Confidential Source for purposes of discussing his plan to orchestrate the murders of Victim-1 and Victim-2. Lawfully-obtained location data revealed that Cellular Phone-1 was located in the vicinity of Baltimore, Maryland at the time that STEWART contacted the Confidential Source.

**Stewart Meets with Purported Hitman**

5. On or about October 25, 2021, STEWART met with an undercover law enforcement agent (the "Undercover Agent") at a location in the District of New Jersey. The Undercover Agent was equipped with two audio recording devices prior to that meeting. During that meeting, STEWART advised the Undercover Agent that he wanted Victim-2 "done first" and then Victim-1 but that he would "pay for both." The Undercover Agent inquired whether STEWART wanted Victim-1 and Victim-2 done in any particular way to which STEWART responded in sum and substance, "F**k no—she dead! I don't give a f**k how you do it!"

6. The Undercover Agent confirmed that if the Undercover Agent can "kill" Victim-2 and then "get" Victim-1, then the Undercover Agent would be paid for both victims. STEWART agreed and assured the Undercover Agent "I got the money."

7. STEWART indicated that he wanted the Undercover Agent to "hit that b***h [Victim-2] first 'cause she started the whole thing" and because STEWART wants to make "her [Victim-1] ass suffer." STEWART advised the Undercover Agent that after the Undercover Agent killed Victim-2, the Undercover Agent should wait approximately six months to kill Victim-1.

8. STEWART also explained that he did not want the Undercover Agent to "hit" Victim-2 outside of the residence because he was concerned that Victim-1 would realize that it was a "hit" and would run. He stated in sum and substance, "If you hit [Victim-2] away from the house" then Victim-1 would "think it was some other s**t," and then the Undercover Agent could "come back and hit [Victim-1] in the house…I don't give a f**k."

9. STEWART also advised the Undercover Agent that STEWART could not commit the murders himself because he needed an "alibi."

10. STEWART provided the Undercover Agent with Victim-1 and Victim-2's names and address. STEWART also described the layout of the property and provided information as to the types of vehicles utilized by both Victim-1 and Victim-2. Additionally, STEWART offered to drive the Undercover Agent to the property. STEWART showed the Undercover Agent a photograph of Victim-1 that STEWART had on his cellular telephone device.

11. During the meeting, STEWART also described his prior attempts to harm Victim-1 and Victim-2. For instance, STEWART stated that he had asked at least one other individual ("Individual-1") to commit the murders previously and had provided Individual-1 with a "brand new gun" but that Individual-1 had

been arrested. STEWART explained in sum and substance that he "did this before…asked somebody to take care of this before and they f**ked up."

12.  Additionally, STEWART explained in sum and substance that he had been arrested after he put a GPS tracking device on Victim-2's vehicle. He stated, "when I went to take it off, I didn't know they had a camera there and they caught the whole s**t."

13.  At one point during the meeting, STEWART left for at least fifteen minutes purportedly to obtain U.S. currency to provide to the Undercover Agent as a partial payment for the killing of Victim-1 and Victim-2. Law enforcement understands that STEWART traveled to a nearby ATM during this time where he withdrew money. Upon STEWART's return, he provided the Undercover Agent with approximately $500.00 in U.S. currency.